## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

```
UNITED STATES OF AMERICA          )
                                  )
          Plaintiff,              )
                                  )
vs.                               )    NO. 2:02-CV-495
                                  )
ROWLAND A. FABIAN                 )
                                  )
          Defendant.              )
                                  )
          ********                )
                                  )
ROWLAND A. FABIAN,                )
                                  )
          Third-Party             )
          Plaintiff,              )
                                  )
vs.                               )
                                  )
NORTHERN INDIANA PUBLIC           )
SERVICE COMPANY,                  )
                                  )
          Third-Party Defendant.  )
```

### OPINION AND ORDER

This matter is before the Court on the:  (1) Defendant's Motion for Summary Judgment to Dismiss Complaint, filed by Defendant, Rowland A. Fabian, on August 24, 2005; (2) the United States' Motion for Summary Judgment and Memorandum of Law in Support, filed by Plaintiff, the United States of America, on August 24, 2005 (with a version corrected for scrivener's errors filed on August 30, 2005); and (3)

Defendant's Request for Oral Argument on Motions for Summary Judgment, filed by Defendant, Rowland A. Fabian, on October 3, 2005.  For the reasons set forth below, Fabian's motion for summary judgment is **DENIED** and the United States' cross-motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.  The United States' motion for summary judgment is **GRANTED** with regards to liability, and **DENIED WITH LEAVE TO REFILE** with regards to the United States' request for injunctive relief and a civil penalty.  Defendant's Request for Oral Argument is **DENIED**.  This matter is set for a status conference at 9:00 a.m. on April 20, 2007 to discuss appropriate deadlines for addressing the damages issues that remain between Fabian and the United States.


BACKGROUND

On December 12, 2002, Plaintiff, the United States of America, filed suit against Defendant, Rowland Fabian, under the Clean Water Act ("CWA"), 33 U.S.C. section 1251 *et seq.*, for damages and/or a remediation order pursuant to 33 U.S.C. section 1319 regarding real estate owned by Fabian, located in Lake and Porter County, Indiana ("Fabian Land").  (Complaint ¶ 1).  The gist of the United States' complaint is that Fabian engaged in certain grading and filling activities on land that the United States claims are wetlands because they are adjacent to Burns Ditch (or the Little Calumet River), which is a tributary of navigable waters, including Lake Michigan and the

-2-

Mississippi River.  (Compl. ¶¶ 19-22).  On May 15, 2003, Fabian filed a two-count third-party complaint naming Northern Indiana Public Service Company ("NIPSCO") as a third-party defendant.

Fabian moved for summary judgment on August 24, 2005.  In his motion, Fabian argues that the Court should dismiss the complaint in its entirety because (1) the United States does not have jurisdiction to regulate the activities on the Fabian Land because there is no surface water connection to Burns Ditch or any other navigable waters of the United States; and (2)even if the land was determined to be wetlands, the areas would be "isolated wetlands," which would lie solely within the control of the State of Indiana, not the United States.

The United States also filed a motion for summary judgment on August 24, 2005.  The United States argues that Fabian is liable under Count I of the complaint, for violation of section 1311, because he added a pollutant from a point source into the waters of the United States without a permit.  The United States argues that Fabian's leveling and grading work added pollutants into the waters of the United States because the wetlands that Fabian filled were "adjacent" to a navigable body of water, and thus qualify as "waters of the United States" under 33 U.S.C. section 1362(7).  The United States also argues that Fabian is liable under Count II of the complaint, for violation of section 1319(d), because he violated a valid order issued by the United States Environmental Protection Agency ("EPA").

Finally, the United States contends that injunctive relief is appropriate, the Court should order restoration of the filled wetlands, and that Defendant should pay a substantial civil penalty.

On March 7, 2006, this Court issued an order staying ruling on the instant motions until the Supreme Court issued its decision in *Carabell v. United States Army Corps of Engineers*, 391 F.3d 704 (6th Cir. 2004). The parties were given 45 days to submit supplemental briefs following the Supreme Court's decision in *Carabell*. The Supreme Court consolidated the cases of *Rapanos v. United States* and *Carabell v. United States*, and issued its decision on June 19, 2006. *Rapanos v. United States*, 126 S.Ct. 2208 (2006). After extensions of time to file supplemental briefs were granted, supplemental briefs were filed on August 3, 2006, August 17, 2006, and August 31, 2006. Additionally, the United States filed a notice of supplemental authority on September 25, 2006, to which Fabian responded on September 29, 2006. After protracted briefing, this case is now fully briefed and ripe for adjudication.


DISCUSSION

The standards that generally govern summary judgment motions are familiar. Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Nebraska v.*

*Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In other words, the record must reveal that no reasonable jury could find for the nonmovant.  *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).  In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmovant.  *Anderson*, 477 U.S. at 255; *Nucor Corp. v. Aceros Y Maquilas De Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The burden is upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes demonstrate an absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the movant has met this burden, the nonmovant may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989).  "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'"  *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (citing *Anderson*, 477 U.S. at 248).

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original); *see also Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate.  Where the parties file cross-motions for summary judgment, the Court must consider each motion, but despite the parties' agreement that no genuine issue of material fact exists, the Court can deny all motions if the parties do not establish their rights to judgment as a matter of law. *Grabach v. Evans*, 196 F. Supp. 2d 746, 747 (N.D. Ind. 2002).

Factual Overview[1]

Fabian is the sole beneficiary of a trust that owns a 30-acre parcel of real estate in Lake Station, Lake County, Indiana.  The United States contends that this land contains wetlands, a contention which Fabian denies.  The Little Calumet River (also known as the Burns Ditch), borders the Fabian Land on the southern and eastern end. There is some dispute among the parties regarding whether this body

---

[1]Facts are developed more completely in the analysis that follows.

of water is navigable in fact.  It is, however, undisputed that it is a tributary to other navigable in fact bodies of water because it shares a surface water connection with Lake Michigan, the Des Plaines River, Illinois River, and Mississippi River. (U.S. Ex. 5, p. 3; U.S. Ex. 1, pp. 24-27; U.S. Ex. 6, p. 1-2.)

It is also undisputed that Fabian's Land is separated from the surface waters of Burns Ditch by an approximately 15 foot high and 130 feet wide levee of Burns Ditch.  (U.S. Ex. 8, p. 5; Fabian Aff., ¶¶ 16-18.)  It is undisputed that Fabian's land has no surface water connection to Burns Ditch or any navigable waters of the United States because of the elevation of the berm.  (*See* United States' Resp. to Def.'s First Request for Admissions Nos. 1, 3, 4 & 5; U.S. Ex. 8.) "The levee prevents direct runoff of surface water from the site to the Little Calumet River."  (U.S. Ex. 8, p. 6.)  Nevertheless, the United States contends that the wetlands allegedly present on Fabian's land contribute to the base flow of the Little Calumet River. (U.S. Ex. 5, p. 7).

In 1997, a state agency expressed interest in acquiring the Fabian land to construct a facility. (U.S. Ex. 7 at 2, ¶ 4).  The prospective buyer hired an environmental engineering consulting firm to determine if wetlands were present.  (U.S. Ex. 7 at 1-2, ¶¶ 1, 4). The inspector, Robert Wolfe ("Wolfe"), determined that approximately 19.5 acres of wetlands existed on the Fabian land. (U.S. Ex. 7 at 2-3, ¶¶ 4-9 & Tab B at Figure 5a and page 7).  Wolfe's report stated that

-7-

"Any regulated impacts to these wetlands will require approval of the [Army] Corps [of Engineers]." (U.S. Ex. 7 at 2-3, ¶¶ 5, 8 & Tab B at 7). Due to the extent of the wetlands present, the prospective buyer lost interest in the land. (U.S. Ex. 7 at 3, ¶ 10).

Fabian engaged in certain activities at the site in March, 1998, that Fabian claims were intended to clean-up debris and tires that NIPSCO had allowed to accumulate along its service road, and to deter further dumping of debris along the NIPSCO service road. (Fabian Aff., ¶¶ 10, 11 & 13). The United States views Fabian's actions as much more invidious, claiming he used bulldozers, grading and leveling equipment to relocate material from areas of the site that were not wetlands to areas that were wetlands, and that approximately 7.5 of the 10 acres Fabian leveled were wetlands. (U.S. Ex. 1, pp. 51-53, 57-58; U.S. Ex. 4, p. 3; U.S. Ex. 5, p. 7; U.S. Ex. 1, p. 44). Fabian denies that the areas in questions were wetlands, and further denies that the areas (even if wetlands) are subject to regulation under the CWA. Prior to his 1998 activities, Fabian did not submit a permit application to the Army Corps of Engineers ("Corps"), request the agency to make a determination of CWA regulatory jurisdiction, or submit any contrary wetlands delineations. (U.S. Ex. A at 143-144).

The United States claims that, prior to Fabian's activities in 1998, a significant area of wetlands existed on the site. (U.S. Ex. 7, p. 3; U.S. Ex. 5, p. 7; U.S. Ex. 4, pp. 2-3). The EPA and the Corps collected site data and determined that wetlands had been

-8-

filled, and that they constituted waters of the United States based on their adjacency to the Little Calumet River. (See U.S. Ex. 5, pp. 3-8). However, citing to hydrologic testing, well data, and aerial and other photographs, Fabian claims that there is insufficient hydrology to support the allegation that 17 acres of wetland exist on the site. (Def.'s Stmt. of Genuine Issues, ¶¶ 1, 2, 3).

Following verbal statements from EPA to Fabian a month earlier, on June 10, 1998, the Corps issued a cease-and-desist order to Fabian. (U.S. Ex. 1 at 152-53; U.S. Ex 5 at ¶ 7 & Tab H). After learning of the Wolfe opinion, on June 25, 1998, EPA issued an administrative compliance order, which directed Fabian, among other things, to propose and implement a plan to restore the filled wetlands. (U.S. Ex. 5, at ¶¶ 7-8 & Tab I thereto). EPA amended the order on July 13, 1999, and again directed Fabian to restore the wetlands. (U.S. Ex. 5, at Tab J). Fabian claims he submitted a proposed restoration plan for the small triangular area to the north of the Wabash Railroad embankment. (Fabian Aff. ¶ 18 and Ex. RF19). To date, Fabian has not implemented an EPA-approved plan to restore the filled wetlands to the condition they were in just prior to March 5, 1998. (U.S. Ex. 1 at 147-48, 151, response nos. 492, 293, 501; U.S. Ex. 5 at 5-6, ¶¶ 8, 10).

Statutory Backdrop

The United States asserts jurisdiction over Fabian's actions

pursuant to the Clean Water Act.  Under sections 301 and 502 of the CWA, 33 U.S.C. sections 1311 and 1362, any discharge of dredged or fill material into "navigable waters" is prohibited without a section 404 permit from the Corps.  *See* 33 U.S.C. §§ 1311(a), 1362(6), 1362(12)(A), 1344(a).  "Navigable waters" is defined by the CWA as "the waters of the United States, including the territorial seas." 33 U.S.C. §1362(7).  The Corps has issued a regulation defining "waters of the United States" as follows:

> (a) The term "waters of the United States" means
>
> (1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;
>
> (2) All interstate waters including wetlands;
>
> (3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters;
>
>     *    *    *
>
> (5) Tributaries of waters identified in paragraphs(a)(1) through (4) of this section;
>
>     *    *    *
>
> (7) **Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a)(1) -(6) of this section.**

33 C.F.R. § 328.3(a)(emphasis added).

The regulations further provide that the term "adjacent" means "bordering, contiguous, or neighboring," and that "[w]etlands,

separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are 'adjacent wetlands.'"  33 C.F.R. § 328.3(c).

The regulations define "wetlands" as "areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions."  33 C.F.R. § 328.3(b); 40 C.F.R. § 232.2.

These regulations have been the subject of countless cases, with the Supreme Court issuing at least three opinions focusing on them since 1985.  In *United States v. Riverside Bayview Homes, Inc.*, a developer who owned low-lying marshy land near a lake began to fill his low-lying lands in preparation for construction of a housing development.  474 U.S. 121 (1985).  The Corp brought suit, claiming that the developer needed a permit from the Corps to proceed.  *Id.* at 458.  The Supreme Court granted certiorari "to consider the proper interpretation of the Corps' regulation defining 'waters of the United States' and the scope of the Corps' jurisdiction under the Clean Water Act."  *Id.*  The Court noted that:

> In determining the limits of its power to regulate discharges under the Act, the Corps must necessarily choose some point at which water ends and land begins.  Our common experience tells us that this is often no easy task: the transition from water to solid ground is not necessarily or even typically an abrupt one.  Rather, between open waters and dry land may lie shallows, marshes, mudflats, swamps, bogs - in short, a huge array of areas that are not wholly aquatic

> but nevertheless fall far short of being dry
> land.

*Id.* at 462.   The Court concluded that "it is reasonable for the Corps to interpret the term "waters" to encompass wetlands adjacent to waters as more conventionally defined."   *Id.* at 462.   The Court further found that:

> We cannot say that the Corps' conclusion that
> adjacent wetlands are inseparably bound up with
> the "waters" of the United States – based as it
> is on the Corps' and EPA's technical expertise –
> is unreasonable.   In view of the breadth of
> federal regulatory authority contemplated by the
> Act itself and the inherent difficulties of
> defining precise bounds to regulable waters, the
> Courts' ecological judgment about the
> relationship between waters and their adjacent
> wetlands provides an adequate basis for a legal
> judgment that adjacent wetlands may be defined as
> waters under the Act.

*Id.* at 464.

In 2001, the Supreme Court considered the Corps' regulations promulgated under the CWA again.   *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. at 159 (2001)("SWANCC").   *SWANCC* came about as a result of the Corps' extension of the definition of "navigable waters" under the CWA to include intrastate waters used as habitat by migratory birds which cross state lines.   In *SWANCC*, the Corps asserted jurisdiction over an abandoned sand and gravel pit containing ponds used by migratory birds.   The Supreme Court held that this assertion of jurisdiction went too far.

Most recently, the Supreme Court consolidated two similar cases

and again considered the question of how far the Corps' jurisdiction over wetlands may stretch. *Rapanos,* 126 S.Ct. at 2208. Unfortunately, the *Rapanos* decision did little to clarify exactly what wetlands fall within the definition of "waters of the United States." As is common today, a majority of the justices of the Court were unable to agree on the proper analysis for determining when adjacent wetlands are subject to the CWA.

The Fractured *Rapanos / Carabell* Decision

Rapanos backfilled wetlands on a parcel of land in Michigan he sought to develop.  The parcel was 11 to 20 miles away from the nearest body of navigable water.  Despite its distance from the navigable water, the wetlands are "connected" to a man-made drain, which drains into a creek, which flows into a river, which eventually empties into Lake Huron.  The Carabells sought a permit to deposit fill material into a wetland about one mile from Lake St. Clair.  A man-made drainage ditch runs along one side of the wetland, separated from it by a 4-foot-wide man made berm which is largely impermeable to water.  This ditch empties into another ditch or a drain, which then connects to a creek which empties into Lake St. Clair.  Thus, both *Rapanos* and *Carabell* requires the Supreme Court to consider whether wetlands adjacent to non-navigable bodies of water are subject to regulation under the CWA.

-13-

Plurality Opinion

Justice Scalia, writing for the plurality, attempted to reign in the Corps' authority to regulate under the CWA in an opinion joined by the Chief Justice, Justice Thomas and Justice Alito.   Justice Scalia began by examining Corps and EPA's interpretations of the CWA as they relate to the "waters of the United States."   *Rapanos*, 2214 S. Ct. at 2215.   The plurality found that during the past three decades both agencies have increasingly defined "waters of the United States" broadly.   *Id.*   So broadly that today, "federally regulated 'waters of the United States' include storm drains, roadside ditches, ripples of sand in the desert that may contain water once a year, and lands that are covered by floodwaters once every 100 years."   *Id.* This broad definition was deemed by the plurality to be a deliberate extension of "waters of the United States" to the outermost limits of Congressional Commerce Clause power.   *Id.* at 2216.

Next, the plurality considered the statutory language.   Finding that the CWA provided for federal jurisdiction over currently used navigable waters and other waters, including waters that might be used for interstate of foreign transportation either in their natural state or with reasonable improvements and adjacent wetlands, the plurality held that the CWA defined "navigable waters" as "something more than traditional navigable waters."   *Id.* at 2220.   Justice Scalia recognized that the term navigable was "not devoid of significance." *Id.* (*citing SWANCC*, 531 U.S. at 172).   However, he held that "the CWA

-14-

authorizes federal jurisdiction *only* over 'waters' … [and that] 'the waters of the United States' in §1362(7) cannot bear the expansive meaning that the Corps would give it." *Id*

> The use of the definite article ("the") and the plural number ("waters") show plainly that § 1362(7) does not refer to water in general.  In this form, "the waters" refers more narrowly to water "[a]s found in streams and bodies forming geographical features such as oceans, rivers, [and] lakes," or "the flowing or moving masses, as of waves or floods, making up such streams or bodies March 22, 2007."

*Id*. at 2220-21 (*citing* Webster's New International Dictionary 2882 (2d ed. 1954)).  Thus, the plurality asserts that "'the waters of the United States' includes only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] . . . oceans, rivers, [and] lakes.'" *Id*. at 2225 (*citing* Webster's New International Dictionary 2882 (2d ed. 1954)).

Having defined "waters of the United States," the plurality analyzed the phrase "adjacent wetlands," recognizing that it is often difficult to determine where water ends and land begins.  To resolve this difficulty, Justice Scalia looked at the court's previous decisions in *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985) and *SWANCC*, 531 U.S. 159 (2001).  In *Riverside Bayview*, the court deferred to the Corps' "inclusion of wetlands 'actually abut[ting]' traditional navigable waters[,]" stating that "the agency could reasonably conclude that a wetland that 'adjoin[ed]' waters of

the United States is itself a part of those waters." *Id.* (*citing Riverside Bayview*, 474 U.S. at 132, 135, and n.9). In contrast, the court in *SWANCC*, addressing isolated ponds, held that ecological considerations were irrelevant to the question of whether physically isolated waters came within the Corps' jurisdiction. *Id.* at 2226. Thus, Justice Scalia reasoned that:

> *only* those wetlands with a continuous surface connection to bodies that are "waters of the United States" in their own right, so that there is no clear demarcation between "waters" and wetlands, are "adjacent to" such waters and covered by the Act. Wetlands with only an intermittent, physically remote hydrologic connection to "waters of the United States" do not implicate the boundary-drawing problem of *Riverside Bayview*, and thus lack the necessary connection to covered waters that we described as a "significant nexus" in *SWANCC*.

*Id.* at 2226 (*citing SWANCC*, 531 U.S. at 167). Justice Scalia went on to identify a two part test for determining when adjacent wetlands are covered by the CWA. "First, that the adjacent channel contains a 'wate[r] of the United States,'. . . and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins." *Id.* at 2227.

<u>Concurring Opinion</u>

In his concurring opinion in *Rapanos,* Justice Kennedy rejected Justice Scalia's two-part test, instead advocating following the significant nexus test outlined in *SWANCC*, 531 U.S. 159 (2001), to determine whether wetlands adjacent to non-navigable in fact waterways

are subject to regulation by the CWA.

Justice Kennedy notes that:

> When the Corps seeks to regulate wetlands adjacent to navigable-in-fact waters, it may rely on adjacency to establish its jurisdiction. Absent more specific regulations, however, the Corps must establish a significant nexus on a case-by-case basis when it seeks to regulate wetlands based on adjacency to nonnavigable tributaries.

*Id.* at 2249.  Justice Kennedy found that using the significant nexus test gives the word "navigable" some effect, even where the Act contemplates regulation of "navigable waters" that are in fact not navigable at all.

> [I]n *SWANCC* the Court rejected the Corps' assertion of jurisdiction over isolated ponds and mudflats bearing no evident connection to navigable-in-fact waters.  And in *Riverside Bayview*, while the Court indicated that "the term 'navigable' as used in the Act is of limited import," ... it relied, in upholding jurisdiction, on the Corps' judgment that "wetlands adjacent to lakes, rivers, streams, and other bodies of water may function as integral parts of the aquatic environment even when the moisture creating the wetlands does not find its source in the adjacent bodies of water,"... The implication, of course, was that wetlands' status as "integral parts of the aquatic environment" -- that is, their significant nexus with navigable waters -- was what established the Corps' jurisdiction over them as waters of the United States.

*Id.* at 2247-48 (citations omitted).

A significant nexus is "assessed in terms of the statute's goals and purposes."  *Id.* at 2248.  Justice Kennedy notes that the Clean

-17-

Water Act was enacted to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Id.* (citing 33 U.S.C. § 1251(a)). Congress "pursued that objective by restricting dumping and filling in 'navigable waters.'" *Id.* Accordingly, wetlands "possess the requisite nexus, and thus come within the statutory phrase 'navigable waters,' if the wetlands . . . significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable'." *Id.* at 2248. However, when the effects of wetlands on water quality are "speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters'." *Id.*

In terms of wetlands, this means the performance of "critical functions related to the integrity of other waters-functions such as pollutant trapping, flood control, and runoff storage." *Id.* at 2248.

> Accordingly, wetlands possess the requisite nexus, and thus come within the statutory phrase "navigable waters," if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as "navigable." When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term "navigable waters."

*Id.* at 2248.

Dissenting Opinion

The dissent, written by Justice Stevens and joined by Justices Souter, Ginsburg and Breyer, asserts that the Court should defer to the Corps and EPA in accordance with *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Rapanos*, 430 U.S. at 2252. Additionally, the dissenting justices believe such deference is in keeping with prior Supreme Court precedent, namely *Riverside Bayview*. *Id.* at 2255. In *Riverside Bayview*, the Court held, pursuant to *Chevron* that their "review [was] limited to the question whether it [was] reasonable, in light of the language, policies, and legislative history of the Act for the Corps to exercise jurisdiction over wetlands adjacent to but not regularly flooded by rivers, streams, and other hydrographic features more conventionally identifiable as 'waters.'" *Id.* (*citing Riverside Bayview*, 474 U.S. at 131). The Court found that the exercise of jurisdiction over the wetlands was reasonable. *Id.*

The dissent notes that, in *Riverside Bayview*:

> we explicitly acknowledged that the Corps' jurisdictional determination was reasonable even though "not every adjacent wetland is of great importance to the environment of adjoining bodies of water. . . . If it is reasonable for the Corps to conclude that in the majority of cases, adjacent wetlands have significant effects on water quality and the ecosystem, its definition can stand. That the definition may include some wetlands that are not significantly intertwined with the ecosystem of adjacent waterways is of little moment, for where it appears that a wetland covered by the Corps' definition is in fact lacking in importance to the aquatic

-19-

> environment… the Corps may always allow
> development of the wetland for other uses simply
> by issuing a permit."

*Id.* at 2256 (quoting *Riverside Bayview*, 474 U.S. at 135, n. 9).
Justice Stevens goes on to point out that Congress had an opportunity
in 1977 to narrow the Corps' jurisdiction over wetlands, if not remove
it entirely, and chose not to do so. *Id.* Furthermore, as regards the
plurality's reliance on *SWANCC*, the dissent notes that "*SWANCC* had
nothing to say about wetlands, let alone about wetlands adjacent to
traditionally navigable waters or their tributaries." *Id.* Instead,
*SWANCC* addressed the "Corps' jurisdiction over isolated waters." *Id.*
The dissenting justices believe "that wetlands adjacent to tributaries
of navigable waters generally have a 'significant nexus' with the
traditionally navigable waters downstream." *Id.* at 2264.

Thus, in accordance with *Riverside Bayview*, the dissent contends
that "it is enough that wetlands adjacent to tributaries generally
have a significant nexus to the watershed's water quality." *Id.* at
2258. Moreover, as made clear in *Riverside Bayview*, such jurisdiction
"does not depend on a wetland-by-wetland inquiry." *Id.* (*citing
Riverside Bayview*, 474 U.S. at 135, n. 9). Finally until such time
Congress or the Corps is convinced "that clean water is less important
today than it was in the 1970's, we continue to owe deference to
regulations satisfying the 'evident breadth of congressional concern
for protection of water quality and aquatic ecosystems' that all of
the Justices on the Court in 1985 recognized in *Riverside Bayview*...."

*Id.* at 2259.

Interpreting Fractured Opinions

The standard for interpreting fractured Supreme Court opinions was announced in *Marks v. United States*, 430 U.S. 188 (1977). According to *Marks* "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five justices, the holding of the court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds..." *Marks*, 430 U.S. at 193 (*citing Gregg v. Georgia*, 428 U.S. 153, 169, n. 15 (1976)).

At the time of this writing, the *Rapanos* decision has been cited in 277 cases. In one of these cases, the Seventh Circuit discussed the impact of this fractured opinion at length. *See United States v. Gerke Excavating, Inc.*, 464 F.3d 723 (7th Cir. 2006). After noting that Justice Kennedy's opinion was the narrowest ground to which a majority of the Justices would have assented if forced to choose, the Court noted that:

> The plurality Justices thought that Justice
> Kennedy's ground for reversing was narrower than
> their own, because they concluded their extensive
> and in places harsh criticism of the concurrence
> by saying that "Justice Kennedy tips a wink at
> the agency [i.e. the Corps of Engineers],
> inviting it to try its same expansive reading
> again." 126 S.Ct at 2234 n. 15. Justice Kennedy
> expressly rejected two "limitations" imposed by
> the plurality on federal authority over wetlands
> under the Clean Water Act, one being the
> requirement of a "continuous surface connection"

-21-

between the wetland and the conventional waterway that it abuts. *Id.* at 2242 (concurring opinion). He accused the majority of being "unduly dismissive of the interests asserted by the United States in these cases. Important public interest are served by the Clean Water Act in general and by the protection of wetlands in particular." *Id.* at 2246.

The test he proposed is that "wetlands possess the requisite nexus, and thus come within the statutory phrase "navigable water,' if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable." When, in contrast, wetlands' effects on the water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'" *Id.* at 2248. This test is narrower (so far as reining in federal authority is concerned) than the plurality's in most cases, though not in all because Justice Kennedy also said that "by saying the Act covers wetlands (however remote) possessing a surface-water connection with a continuously flowing stream (however small), the plurality's reading would permit application of the statute as far from traditional federal authority as are the waters it deems beyond the statute's reach." *Id.* at 2246.

Thus, any conclusion that Justice Kennedy reaches in favor of federal authority over wetlands, in a future case will command the support of five Justices (himself plus the four dissenters), and in *most* cases in which he concludes that there is no federal authority he will command five votes (himself plus the four Justices in the *Rapanos* plurality), the exception being a case in which he would vote against federal authority only to be outvoted 8-to-1 (the four dissenting Justices plus the members of the *Rapanos* plurality) because there was a slight surface hydrological connection.  The plurality's insistence that the issue of federal authority be governed by strict rules will on occasion align the Justices in the

-22-

> plurality with the *Rapanos* dissenters when the
> balancing approach of Justice Kennedy favors the
> landowner.  But that will be a rare case, so as
> a practical matter the Kennedy concurrence is the
> least common denominator (always, when his view
> favors federal authority).

*Gerke*, 464 F.3d at 724-25.


<u>Count I</u>

Count I of the complaint alleges that Fabian violated 33 U.S.C. section 1311.  To establish a violation of this provision, the United States must prove that (i) a person (ii) added a pollutant (iii) from a point source (iv) into waters of the United States (v) without a permit.  *See* 33 U.S.C. §§ 1311(a), 1344(a), 1362(5)-1362(14); *Greenfield Mills, Inc. v. Macklin*, 361 F.3d 934, 947 (7th Cir. 2004). Fabian concedes all elements of Count I except two; namely, Fabian contends that he did not *add* a pollutant into *waters* of the United States.

<u>Is Fabian's Property Subject to the CWA?</u>

The instant summary judgment motions each require this Court to resolve, as a preliminary matter, whether the property at issue here is subject to the CWA; in other words, whether the property contains a water of the United States.  In making this determination, this Court must first determine whether the property contains wetlands. As noted previously, "[t]he term 'wetlands' means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances

-23-

do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(b).

United States has produced considerable evidence that the lands at issue here qualify as wetlands. Robert Wolfe, director of ecological services and vice president of J.F. New & Associates, Inc., inspected the Fabian land on December 11, 1997. Wolfe issued a report in January 1998 in which he concluded that a significant portion of the site (19.5 acres) constituted wetlands within the regulatory jurisdiction of the Corps. (U.S. Ex. 7 at ¶ 4-9, 11 & Tab B). Wolfe found both primary and secondary indicators of wetlands hydrology. (U.S. Ex. 7 Tab B at App A). Additionally, Gregory Carlson, a Life Scientist and Enforcement Officer with the EPA inspected the site in April 1998. (U.S. Ex. 5 ¶ 6). Carlson states that during that inspection, he observed site disturbances, hydric soils, hydrology (including surface inundation), and hydrophytic vegetation. (*Id.*). And, Peter Stokely ("Stokely"), an Environmental Scientist and Regional Expert in Aerial Photography Interpretation, employed with the EPA, examined aerial photography of the site spanning from 1965 through 1998. (U.S. Ex 4). Stokely found that the photographs showed the signature of wetlands conditions within areas of the Fabian parcel. (*Id.*). And, by reviewing aerial photographs from April 1998, after Fabian altered the site, Stokely concluded that "approximately 7.5 acres of wetlands on the Site were impacted by the activities of 1998." (*Id.* ¶ 5).

-24-

Fabian contends that the lands are not wetlands. Fabian notes that "wetland boundaries are delineated using as a guideline three diagnostic environmental characteristics: hydrophytic vegetation, hydric soils and wetland hydrology." (*See* Corps of Engineers Wetland Delineation Manual (1987)). Fabian contends that, according to the Corps' wetland delineation manual, each of these criteria must be found to exist to make a positive wetland determination. (*Id.* at 13, part II, ¶ 26c). Fabian states that the "*sine qua non* before any area can be determined to be a wetland is the presence of water saturating the soil to the surface for a significant period of time during the growing season." (Def.'s Statement of Gen Issues at 13).

The United States agrees with Fabian that the manual was used to determine that the areas in question are wetlands, and admits that the manual requires an examination of an area's hydrology, vegetation, and soils. (United States' Reply Memorandum at 3). But, the United States notes that, in situations where unauthorized activities have disturbed a site, direct evidence of all three parameters is not often available. (*Id.*) The manual provides that, in those circumstances, scientists may infer one of the three paramaters without direct evidence. (*See* Manual at § IV.F and *United States v. Thorson*, No. 03-C-0074-C, 2004 WL 737522, at *5 (W.D. Wis. Apr. 6, 2004)).

Fabian does not contest the United States' claim that the site has ample indicators of wetland soils and wetland vegetation, but Fabian does claim that the site lacks sufficient hydrology. Fabian

points to hydrologic testing performed at the site in 2000 to support his claim. (Def.'s Statement of Genuine Issues at 4). Specifically, Fabian contends that this study showed that water was present for less than 10 days within the top 12" of the soil in the area located in the east half of the site south of the NIPSCO service road. (Citing Fabian Aff. ¶ 15 and Ex. RF18). Fabian cites to other evidence that water was not encountered closer than 5 feet below ground level from June 2003 through May 2004, and evidence from 2000 that no water was encountered in certain bore holes. (Def.'s Statement of Genuine Issues at 4). Fabian also relies upon aerial photographs which he claims show that the site lacks sufficient hydrology to sustain a wetland condition. (Fabian Aff. ¶¶ 3, 14, 18, Ex. FR2, RF6, RF17.1, RF 17.2, RF 19).

None of Fabian's evidence directly contradicts the evidence presented by the Government, which establishes that the land in question contains some areas that are properly deemed wetlands. The absence of direct evidence of sufficient hydrology in the period of time after Fabian altered the wetlands in question does not defeat the United States' claim. Because the area has been altered by Fabian, under the manual, it was appropriate for the United States to rely on aerial photography and other indirect indicators to determine wetlands hydrology. (Manual ¶¶ 71-75 at 73-82). Furthermore, Fabian does not offer the opinion of any scientist or wetlands expert of any kind to refute the evidence offered by the United States. And, Fabian admits

that "intermittent ponding" occurs in areas of the site, stating that "[a]reas where intermittent ponding has occurred on the Site are west of the Sign Road to the South of the NIPSCO service road on State of Indiana land, and to the immediate north of the NIPSCO service road in an area south of the 200' wide former Wabash Railroad embankment." (Citing Fabian Aff. ¶ 17, Ex. FR1, and 21.).

Because Fabian has failed to present any opinion (other than perhaps his own) that the areas in question are not wetlands, instead asking this Court to draw conclusions from his evidence that cannot be drawn by this Court, this Court concludes that Fabian's "evidence" that the site lacks sufficient hydrology is insufficient to prevent summary judgment. For purposes of the instant summary judgment motions, this Court finds that the United States has set forth sufficient facts from which a jury could find that the lands at issue are wetlands, and Fabian has failed to adequately rebut those facts.

Having found that the property at issue contains wetlands, this Court now considers whether the wetlands at issue can properly be deemed "adjacent" wetlands. The parties dispute whether the wetlands in question are sufficiently close to the Little Calumet to be deemed "adjacent" to it. This Court must look to Justice Kennedy's concurring opinion in *Rapanos*, as it is likely the decisive analysis in determining whether the wetlands are adjacent to the Little Calumet within the meaning of the CWA. Justice Kennedy adopted the Corps' definition of adjacency. *Rapanos*, at 2238. As was noted earlier, the

Corps defines adjacent as "bordering, contiguous, or neighboring," and the Corps' regulations state that "[w]etlands, separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are 'adjacent wetlands.'"  33 C.F.R. § 328.3(c). The facts are not in dispute here.  A drawing submitted by the United States outlines an area described as 1998 wetland fill. (U.S. Ex. 4, Fig 2).  This area neighbors, at least in part, the berm that separates the areas in question from the Little Calumet River.  While Fabian claims, in his affidavit, that any wetlands on the site are not adjacent (Fabian Aff. ¶ 16), he fails to support this claim with any evidence.  Given the breadth of the Corps' definition, based on the evidence before this Court, this Court finds that the wetlands at issue are "adjacent".

Now that it is established, for purposes of this motion, that the wetlands are adjacent to the Little Calumet River, it must be determined whether the Little Calumet River is navigable-in-fact. Fabian would have this Court believe that the distinction between navigable-in-fact and non-navigable-in-fact waters is irrelevant here, and that in either case Justice Kennedy's substantial nexus test must be applied.  That is not the case.  Justice Kennedy's concurring opinion states that:

> When the Corps seeks to regulate wetlands adjacent to navigable-in-fact waters, it may rely on adjacency to establish its jurisdiction. Absent more specific regulations, however, the Corps must establish a significant nexus on a case-by-case basis when it seeks to regulate

wetlands based on adjacency to nonnavigable tributaries.

*Rapanos*, 126 S.Ct. at 2249. Despite this language, Fabian argues that, with regards to anything Justice Kennedy may have to say about wetlands adjacent to navigable-in-fact bodies of water, it is mere dicta, because the facts before the Supreme Court involved non-navigable waters. Fabian also points to a Ninth Circuit case in which the Ninth Circuit completely ignores Justice Kennedy's position with regards to navigable waters. *Northern California River Watch v. City of Healdsburg*, 457 F.3d 1023, 1025 (9th Cir. 2006)(stating that Justice Kennedy requires a significant nexus to a waterway that is in fact navigable, that "Adjacency of wetlands to navigable waters alone is not sufficient", and failing to differentiate between wetlands adjacent to navigable-in-fact waterways and wetlands adjacent to non-navigable-in-fact waterways). With all due respect, this Court believes the Ninth Circuit erred in failing to give effect to Justice Kennedy's position with regards to navigable waters.

Justice Kennedy's analysis is key here for the following reasons. The four dissenting Justices would find that jurisdiction exists regardless of whether the Little Calumet River is navigable-in-fact because it is without question that the Little Calumet River is a tributary of a navigable in fact water (actually several). And, because it is undisputed that the wetlands at issue do not have a surface water connection to the Little Calumet River, the four Justice plurality would find that the wetlands at issue are not within the

-29-

jurisdiction of the CWA. Thus, Justice Kennedy's analysis is dispositive of the jurisdictional question under the facts of this case.

If the Little Calumet River is navigable-in-fact, Justice Kennedy would find as a matter of law that jurisdiction exists. *Rapanos*, 126 S.Ct. at 2249. Accordingly, this Court must next consider whether the Little Calumet is navigable-in-fact. Under the Corps' regulations, "waters of the United States" includes "[a]ll waters which are currently used, or were used in the past or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide." 33 C.F.R. § 328.3(a)(1).

The United States claims that the Little Calumet can and does support boat traffic and has been specifically found by the Corps to be at least susceptible for use in interstate commerce." (Statement of Material Facts at ¶¶ 7-8, citing U.S. Ex. 6 Declaration of David A Cohen; U.S. Ex. 5 at Tab C). The United States relies upon a 1982 report of the Corps finding that "the Little Calumet River - Burns Waterway in Illinois and Indiana is navigable" based on both present and historical use. (U.S. Ex. 5, Tab C). The United States also relies upon the declaration of David A. Cohen ("Cohen"). (U.S. Ex. 6). Cohen is a hydrologist with the United States Geological Survey. On October 3, 2002, he and another hydrologist navigated a reach of the Little Calumet River in an aluminum Grumman canoe to obtain data on the width and depth of the Little Calumet River. (*Id.*) Cohen

estimated stream depths of 1.5 to 8 feet at numerous distinct points, and easily canoed through the Little Calumet River with no need for any portaging.  (*Id.*).

However, Fabian points out that even the Government's report notes that the water level at this location ranges from less than 9 inches to a high of 3'9".[2]  (U.S. Ex 8, pp 11, 14-16, Table 1 & 2). Fabian also relies upon his affidavit, in which he claims:

> The waters of Burns Ditch located in the area to the south of the Site are more than 2 miles from Lake Michigan and several miles east of a connection with the Little Calumet River, and the waters of Burns Ditch is crossed in either of these directions by several bridges and other structures that would impede the navigation along Burns Ditch of vessels engaged in interstate commere from either Lake Michigan or interstate rivers to the west.

(Fabian Aff. ¶ 16).

This Court questions how likely it is that this body of water will be used for any substantial commerce.  Nonetheless, the United States has produced evidence that it is a navigable body of water, and Fabian has failed to adequately refute that evidence.  Fabian has offered only his own observations, and those without such detail as to demonstrate that the body of water in question is not navigable within the meaning of the CWA.  Fabian was free to submit the opinion of an expert or other individual that the body of water in question

---

[2]It is not clear exactly how Fabian arrived at these numbers, but for purposes of the instant summary judgement motion this Court accepts them as true.

is not navigable, and he did not.

Because this Court finds that the Little Calumet is navigable in fact, under *Rapanos*, Justice Kennedy and the dissenting justices would find that the wetlands in question are subject to the CWA.  As this is the only issue raised by Fabian in his motion for summary judgment, Fabian's motion for summary judgment must be **DENIED**.

Did Fabian *Add* a Pollutant to the Wetlands?

Having established that the lands at issue are within the jurisdiction of the CWA, only one issue remains in order for summary judgment to be granted in favor of the United States on Count I with regards to liability.  Namely, whether Fabian "added" a pollutant to waters of the United States.   33 U.S.C. Section 1362(12) defines discharge of a pollutant to include "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).

Fabian concedes that a portion of the site was altered in his 1998 clean-up activities. (Fabian Aff. ¶¶ 13).  Fabian admitted that from March 5, 1998 through March 27, 1998, his agents laterally moved earthen material, dirt, sand, soil, clay, rock, biological material, brush, stumps, and/or vegetation.  (U.S. Ex 1 at 41, 56, 61-65; U.S. Ex. 2 at 6, definition #27).  But, Fabian argues that his activities lowered rather than raised the elevation of the land to the north of the NIPSCO service road, and thus cannot be construed as an addition.  However, a review of the cases discussing "discharge of a pollutant" demonstrate a very broad understanding of what it means to "add" a

pollutant.   For example, sidecasting (the deposit of dredged or excavated material from wetland back into the same wetland) qualifies as the discharge of a pollutant even though there is no net increase in the material present in the wetland.  *U.S. v. Deaton*, 209 F.3d 331 (4th Cir 2000).  And, depositing material that came from a streambed or wetland back into the same streambed or wetland is also considered an addition.  *See Rybachet v. U.S.*, 904 F.2d 1276, 1285 (9th Cir. 1990); and *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 923 (5th Cir. 1983)(noting that "the word 'addition', as used in the definition  of the term 'discharge,' may reasonably be understood to include 'redeposit.'").  Accordingly, under the broad interpretation of the "addition" of a pollutant adopted by numerous courts, Fabian's lateral movement of earthen materials qualifies as an addition, even if the end result is a decrease in elevation.

Fabian also attempts to classify his actions as creating merely "incidental fallback", noting that incidental fallback from excavation activities that lower the elevation of an area are not additions and therefore not regulated.  (Def's Stmt of Gen Issues at 22-23, citing *American Mining Congress v. United States Army Corps of Engineers*, 951 F.Supp. 267 (Dist. DC, 1997) and *National Mining Association v. United States Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)).  However, the Unites States, in reply, notes that "The regulations speak only to 'incidental fallback,' such as bucket droppings, under which the redeposit of small volumes of dredged material incidental

to excavation activities is not regulated if such material falls back to substantially the same place as the initial removal." (United States Reply Memo at 12, n. 13, citing 33 C.F.R. § 323.2(d)(2)(ii)). On this matter, the United States is correct. Although Fabian raised the exception, he has not established that his movements of earthen materials fits within the incidental fallback exception. Fabian has not even attempted to demonstrate that the material fell back into substantially the same place as the initial removal. Accordingly, summary judgment is **GRANTED** to the United States on Count I.


Count II

Count II alleges that Fabian violated the CWA by failing to comply with the EPA's orders. (Complaint ¶¶ 28-32). Pursuant to 33 U.S.C. § 1319(d), the United States must show that a person violated a valid order issued by the EPA under subsection (a) of the same section. The parties agree that this Count stands or falls with Count I. (*See* Defendant's Statement of Genuine Issues and Response Brief in Opposition to Plaintiff's Motion for Summary Judgment, at 21, stating "Thus, the United States must first establish a violation of CWA under Count I of its Complaint under 33 U.S.C. § 1319(b) before any liability for injunctive or monetary relief can be found to exist against Fabian.").

On June 10, 1998, the Corps issued a cease-and-desist order to Fabian. (U.S. Ex. 1 at 152-53; U.S. Ex 5 at ¶ 7 & Tab H). On June

-34-

25, 1998, EPA issued an administrative compliance order, which directed Fabian, among other things, to propose and implement a plan to restore the filled wetlands. (U.S. Ex. 5, at ¶¶ 7-8 & Tab I thereto). EPA amended the order on July 13, 1999, and again directed Fabian to restore the wetlands. (U.S. Ex.5, at Tab J). Fabian claims he submitted a proposed restoration plan for the small triangular area to the north of the Wabash Railroad embankment. (Fabian Aff. ¶ 18 and Ex. RF19). But, to date, Fabian has not implemented an EPA-approved plan to restore the filled wetlands to the condition they were in just prior to March 5, 1998. (U.S. Ex. 1 at 147-48, 151, response nos. 492, 293, 501; U.S. Ex. 5 at 5-6, ¶¶ 8, 10).

On Count II, because this Court has found that a CWA violation occurred, and because the United States has established that Fabian violated a valid EPA order and Fabian has failed to offer facts that would demonstrate otherwise, summary judgment is also **GRANTED** to the United States on Count II.

The United States' Request for Injunctive Relief and Damages

The United States' summary judgment motion sought not only a finding regarding liability, but also permanent injunction against future violations, an order directing Fabian to restore the affected wetlands, and entry of a civil penalty against Fabian. At this point, it appears from the record that each of the forms of requested relief are likely appropriate (and indeed some may be required). However, not all of the facts necessary for this Court to make these

determinations are before the Court.  For example, almost a decade has now passed since the violations occurred.  What is the current state of the wetlands?  Has nature restored the wetlands to any extent?  Having suffered nearly a decade of litigation, is Fabian really likely to alter the wetlands again without a permit from the Corps, such that a permanent injunction is necessary?  What about the fact that it appears that the United States has been rather gracious to NIPSCO[3], who may very well share some responsibility here, while apparently (from their request for civil penalty) showing no mercy for Fabian whatsoever?  Was Fabian really acting invidiously, or was he simply operating under the mistaken belief that the areas were not wetlands when he tried to improve his property by removing rubbish?  Does Fabian's experience as a land surveyor make him more culpable than other CWA violators, or less?  In other words, could his experience have reasonably led him to conclude that the areas in question were not wetlands subject to the CWA?  Given Fabian's current income level, is a large civil penalty (the United States is seeking, in addition to restoration, a civil penalty of $632,500) necessary?  Although the Court possesses some information regarding Fabian's income, what assets does Fabian possess?

While the parties did devote a significant portion of their

---

[3]At one point, Fabian alludes to NIPSCO receiving an after the fact permit which may have ratified any CWA violations that they were liable for, while the same courtesy was not extended to Fabian.

briefs to these issues, the details are still not sufficient to permit the awards sought by the United States.  Fabian does bear the burden of showing mitigating factors.  But, in the briefs before this Court, Fabian (perhaps rightly so) focused his energies on contesting liability rather than mitigating damages.  When so much is at stake, this Court is not inclined to enter an order of restoration, a permanent injunction, or civil penalty absent further factual development by the parties.

Accordingly, the United States' motion for summary judgment is **DENIED WITH LEAVE TO REFILE** with regards to the issuance of a permanent injunction, order of restoration, and entry of a civil penalty.


CONCLUSION

For the reasons set forth above, Fabian's motion for summary judgment is **DENIED** and the United States' cross-motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.  The United States' motion for summary judgment is **GRANTED** with regards to liability, and **DENIED WITH LEAVE TO REFILE** with regards to the United States' request for injunctive relief and a civil penalty.  Defendant's Request for Oral Argument is **DENIED**.  This matter is set for a status conference at 9:00 a.m. on April 20, 2007 to discuss appropriate deadlines for

addressing the damages issues that remain between Fabian and the United States.


DATED: March 29, 2007                    /s/RUDY LOZANO, Judge
                                         United States District Court